**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **WALTER BARTON,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 14-08001-CV-W-GAF** |
| | ) | |
| | ) | |
| | ) | |
| **TROY STEELE, et al.,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## ORDER

Now before the Court is Movant Walter Barton's ("Movant" or "Barton") First Amended

Petition for Writ of Habeas Corpus and Request for Hearing ("Amended Petition"), brought

pursuant to 28 U.S.C. § 2254. (Doc. # 33). Respondents Cindy Griffith and Chris Koster

(collectively, "Respondents" or the "State") oppose. (Doc. # 45). For the reasons stated herein,

Movant's request is DENIED.

## DISCUSSION

**I.      BACKGROUND**

**a.      The Murder of Gladys Kuehler**

On direct appeal, the Supreme Court of Missouri summarized the underlying criminal

allegations as follows:

> The victim [Gladys Kuehler], who was 81 years old, was the manager of a mobile
> home park in Ozark, Missouri, and lived in a trailer she owned there. On the
> morning of October 9, 1991, Carol Horton, another resident of the park, went to
> the victim's trailer to assist her because she was infirm and unable to move about
> without the use of a cane. Horton left for a while to shop for the victim and to
> retrieve her mail and returned at about 11:00 a.m. When Horton saw the victim at

1

that time, the victim was sitting on a daybed she kept in her living room, and she looked like she was "doing okay."

Around noon that day, [Barton] came to Horton's trailer. [Barton] regularly frequented the park, but Horton had not seen him in a week, and appellant told her he had been living in his car. He was in a "happy-go-lucky" mood, talking and "dancing around" to radio music in Horton's trailer. He stayed at Horton's until around 2:00 p.m., when he said he was going to the victim's trailer to see if the victim would lend him $20.00, and he returned about 10–15 minutes later, still in a good mood.

Between 2:00 and 3:00 p.m., several people had contact with the victim at her trailer. Teddy Bartlett and his wife, and Sharon Strahan, all former residents of the trailer park, visited the victim around 2:00 p.m. and stayed until sometime around 2:45. While they were there, Dorothy Pickering, who co-owned the trailer park with her husband, Bill, and who was at the park with her husband cleaning a trailer, stopped by the victim's trailer to pick up some rent payments. A man named Roy also stopped by to return a fan and a magazine to the victim. In addition, at about 2:30, Debbie Selvidge, the victim's granddaughter, called the victim and spoke with her briefly. The visitors all left when the victim said she was not feeling well and was going to take a nap.

Meanwhile, [Barton] told Horton that he was going back to the victim's trailer, and left sometime around 3:00. As Bartlett and Strahan left, Strahan noticed appellant standing at the driver's side door of a pickup truck parked near the victim's trailer talking to someone inside the truck. Shortly thereafter, around 3:15 p.m., Bill Pickering called the victim's trailer because his wife said the victim wanted to talk to him about someone moving into the park. A male voice answered the telephone, and Pickering asked to speak with the victim. The man hesitated, and then said, "She's in the bathroom." Pickering then told the man who he was and asked to have the victim call him back.

Around 4:00 p.m., about an hour after he left Horton's trailer, [Barton] returned and asked to use her restroom, which she permitted. After a while, Horton noticed that appellant had been in there for a long time, and she had never heard the toilet flush, so she went to check on him and saw him at the sink. He said he had been working on a car and was washing his hands. All told, appellant spent about ten minutes or so in the bathroom. Horton also noticed, however, that appellant's mood had changed, and now, instead of being jovial as he was before, he was distant and seemed in a hurry. He asked her if she would take him to the "Fast Track" to get his car, but she said she could not, because she was going to the victim's trailer. At that point, appellant said, in a "very strong," definite voice, "No, don't . . . Ms. Gladys is lying down taking a nap." Horton went anyway, knocking on the victim's door around 4:15 p.m., but there was no answer, and Horton then left the park to get her car washed.

2

In the meantime, Selvidge called the victim at 4:00 p.m., as the two watched the same television program together everyday while talking on the telephone. When there was no answer, Selvidge went to the trailer to check on her grandmother. She knocked for some time, but there was no answer, and she noticed that there were no lights on, which was unusual, because the victim always left the porch light on when leaving the trailer. Selvidge then left the park to seek help from her mother.

At about 4:30, Horton returned home and went back to the victim's trailer to check on her, but again received no answer to her knocking. Between 6:00 and 6:30, Selvidge arrived back at the park and went to Horton's trailer, asking about the victim and telling Horton she had been trying to call the victim since 4:00. The two of them then returned to Selvidge's mother's house to try to call the victim again, and when they still were unsuccessful, they went back to the park and asked appellant, who had been at a neighbor's trailer, to help knock on the door again. The three took turns knocking on the door and calling out the victim's name, and appellant went over to the end of the trailer where the victim's bedroom was located and knocked on the side of the trailer. There still was no response so they decided to contact the police.

Horton and Selvidge then drove to the nearby town square, flagged down an Ozark police officer, and led him back to the park. After unsuccessfully attempting to enter the victim's trailer, the officer called for a locksmith, and then left to take care of another call. A short time later, the locksmith arrived and opened the front door, and Selvidge, Horton, and appellant entered the trailer.

Once inside, they called the victim's name, but received no answer. Selvidge started to walk down the hallway leading to the victim's bedroom when [Barton] said, "Ms. Debbie, don't go down the hall. Ms. Debbie, don't go down the hall." Selvidge noticed that the victim's clothes were in the bathroom by the stool and that the toilet lid was up, which was unusual. She then turned on the lights in the victim's bedroom and screamed as she found the victim, "practically nude," lying on the floor between her bed and closet. The victim had been stabbed numerous times, with her throat cut ear-to-ear and with her intestines eviscerating from some of her wounds. Selvidge started to bend down to touch the victim, but Horton, who had followed Selvidge down the hall to the bedroom, told her not to do so. Selvidge then went back into the hall, pushed past Horton and [Barton], who was following Horton, and went back to the living room. [Barton] said to Horton, "Let me see," and looked over Horton's shoulder into the bedroom at the victim, but he never got close to the body or the blood in the bedroom. [Barton] did not get upset upon seeing the victim, but remained calm, showing no emotion, and when he went back into the living room, he "comforted" Selvidge, telling her that he was "so sorry."

The police officer soon returned to the trailer, and after seeing that the victim had been stabbed, he cleared the scene and called for help. After paramedics arrived,

the officer interrogated those persons present. He asked [Barton] if he had seen the victim that day, and [Barton] told him that he had seen her between 2:00 and 2:30 that afternoon when he had asked her to lend him $20.00. He said that the victim told him she would lend him the money, but would have to write a check, which she would do later in the day. [Barton] claimed that this was the last time he had been there. However, [Barton] later spoke with a Highway Patrol investigator and told him that he was the one who answered the telephone call that Bill Pickering made at 3:15 that afternoon. Because that call occurred between when the victim was last seen alive and when she was found dead, the officers took [Barton] into custody.

At that point, the officer noticed what appeared to be blood on the elbow and shoulder of [Barton's] shirt, and [Barton] responded that he had gotten the blood on him when he slipped while pulling Selvidge away from the victim's body. Selvidge, however, reported that she had not gone in the room past the victim's feet, that she had no blood on her clothes, that nobody had fallen in the room, and that appellant and Horton had remained behind her while she was in the room. Police also noticed that neither Selvidge nor Horton had blood on them, that the victim's blood on the floor was "pretty well dried," as if it had been there for a while, and that there was no wet blood to slip on where the witnesses were standing in the room.

The investigation of the scene also revealed that there was blood on the sink of the victim's bathroom and on a table in the bathroom. The victim's checkbook was found. Although the victim regularly entered every check she wrote in her check register, there was no entry for check # 6027—that check was missing. Several knives also were seized from the scene, including one that was part of a set that was cleaner than the others and facing a different direction in the block, and another knife that was later found in a drainage ditch. Although none of these knives were positively identified as the murder weapon, the examiners did not exclude any of those knives as the murder weapon.

Three days after the murder, a young girl was cleaning up trash along a nearby highway with a group from her church when she found the missing check, # 6027, folded up and discarded in a ditch. The check was dated the same day of the murder and made payable to [Barton] for $50.00. Handwriting analysis confirmed that the victim had written everything on the check.

Tests conducted on [Barton's] clothing revealed that there was human blood on his shirt, blue jeans, and boots, and DNA tests conducted on the blood from [Barton's] shirt showed that it was the victim's blood. A blood spatter expert testified that some of the blood found on appellant's shirt, as well as two spots on [Barton's] jeans, were consistent with stains created by a "medium-to-high-energy impact," meaning the blood was ejected from the source by a blow or "transfer of energy" and not by simply rubbing up against already-present blood.

4

An autopsy conducted on the victim revealed that she was stabbed well in excess of 50 times, including being stabbed twice through her open right eye and once in the left eyelid, twice in the neck, eleven times in the left side of her chest, three times in the right chest, four times in the abdomen, twice to the back of the left hand (characterized as defensive wounds), twice to the back of the left arm, twenty-three times in the back, and three times in the left flank. There were at least two large slash wounds across her neck, one of which contacted the bone. There were also two X-shaped slash wounds to the abdomen, through one of which the victim's small intestine protruded. Internally, the victim's left lung collapsed, and one of her ribs fractured from the force of the attack. The cause of death was exsanguination due primarily to the wounds to her neck as well as the numerous other stab wounds. There was also at least one blunt force injury to the victim's head, and some bruising and injury to the victim's genital area that led examiners to the conclusion that the victim was sexually assaulted.

*State v. Barton*, 240 S.W.3d 693, 696-699 (Mo. 2007) (en banc).

**b.     Procedural History**

This case's procedural history is lengthy and complex.  The Court will refer to Barton's

various appearances before the Missouri Supreme Court as follows:

> *State v. Barton*, 936 S.W.2d 781 (Mo. 1996) (en banc) ("*Barton I*")
>
> *State v. Barton*, 998 S.W.2d 19 (Mo. 1999) (en banc) ("*Barton II*")
>
> *Barton v. State*, 76 S.W.3d 280 (Mo. 2002) (per curiam) ("*Barton III*")
>
> *State v. Barton*, 240 S.W.3d 693 (Mo. 2007) (en banc) ("*Barton IV*")
>
> *Barton v. State*, 432 S.W.3d 741 (Mo. 2014) ("*Barton V*")
>
> *Barton v. State*, 486 S.W.3d 332, 339 (Mo. 2016) (en banc) (*Barton VI*)

Since his original arrest in 1991, the State of Missouri has initiated five separate trials

against Barton.  The State's first two attempts to convict him resulted in mistrial–the first due to

the prosecution's failure to endorse any witnesses, and the second because the jury remained

deadlocked on the issue of guilt.  The State achieved a guilty verdict and sentence of death on its

third attempt, only to have the verdict overturned on direct appeal due to the trial judge's

improper restriction of defense counsel's closing argument.

5

The State's fourth attempt resulted in another guilty verdict and death sentence. The verdict survived the direct appeal process, eventually being affirmed by a 5-2 vote by the Missouri Supreme Court. *See Barton II*, 998 S.W.2d at 30. Barton then filed for post-conviction relief under Missouri Rule of Criminal Procedure 29.15. The motion court denied Barton's request for relief, but the Missouri Supreme Court reversed and remanded, citing the motion court judge's failure to make sufficiently specific findings of fact. *Barton III*, 76 S.W.3d at 280-281. Further, the Supreme Court rescinded the motion court judge's appointment to oversee the post-conviction proceedings. *Id.* After the hearing on remand, Benton County Circuit Judge John Sims set aside Barton's conviction and sentence, and ordered a new trial. (*See* Doc. # 36-1).

The State opted to prosecute Barton a fifth time. The trial began in March 2006, and took place in Cass County, Missouri. The jury returned a guilty verdict, and Circuit Judge Joseph Dandurand imposed the death sentence. In 2007, the Missouri Supreme Court affirmed Barton's death sentence by a 4-3 margin. *See Barton IV*, 240 S.W.3d at 711. Barton's direct appeal process was finally exhausted in October 2008, when the United States Supreme Court denied his petition for writ of certiorari. *See Barton v. Missouri*, 555 U.S. 842 (2008). Subsequently, Barton again moved for post-conviction relief under Rule 29.15. The motion court denied his request for relief in February 2013, and the Missouri Supreme Court unanimously affirmed the judgment and issued its mandate on June 24, 2014. *See Barton V*, 432 S.W.3d at 764.

On June 9, 2015, Barton filed a habeas request under 28 U.S.C. § 2254 with this Court. (*See* Docket Sheet). On the same day, Barton's attorneys filed an additional state court challenge in Cass County, Missouri, requesting the court find that Barton's previous attorneys abandoned

6

him during a portion of the state court post-conviction proceedings. (Doc. # 36-29). That filing was titled "Request for Finding of Abandonment of Counsel." (*Id.*). This Court stayed its proceedings while Barton's state court motion was pending. (*See* Doc. # 26). The Circuit Court for Cass County eventually denied Barton's abandonment claim, and the Missouri Supreme Court affirmed on May 24, 2016. *See Barton VI*, 486 S.W.3d at 339. Barton filed his Amended Petition later that same day. (*See* Docket Sheet). Subsequently, this Court lifted the stay, leading to its consideration of the present motion. Barton then filed an Amended Petition on May 24, 2016, adding three new habeas claims.

### c.    Summary of Asserted Grounds for Habeas Relief

Barton brings the following claims under 28 U.S.C. § 2254:[1]

**Ground I:** Violation of the Double Jeopardy Clause of the Fifth Amendment

**Ground II:** Withdrawn

**Ground III:** Withdrawn

**Ground IV:** Withdrawn

**Ground V:** Ineffective Assistance of Counsel–Failure to impeach Katherine Allen

**Ground VI:** Ineffective Assistance of Counsel–Failure to appeal Katherine Allen's testimony regarding prior convictions

**Ground VII:** Ineffective Assistance of Counsel–Failure to call witness to rebut State's blood spatter expert

**Ground VIII:** Ineffective Assistance of Counsel–Failure to appeal trial court's failure to declare mistrial after State did not corroborate its opening statement with supporting testimony

**Ground IX:** Ineffective Assistance of Counsel–Failure to appeal jury instructions

---

[1] Barton advanced twelve claims in his original petition, and included three additional claims in his amended petition. (Docs. ## 18, 33). However, Barton withdrew three claims in his Suggestions in Support of the Amended Petition. (Doc. # 36, pp. 52-53).

**Ground X:** Ineffective Assistance of Counsel–Failure to appeal inclusion of victim impact evidence during penalty phase

**Ground XI:** Ineffective Assistance of Counsel–Failure to develop and present mitigation defense

**Ground XII:** Ineffective Assistance of Counsel–Failure to assert that Barton was incompetent
          a.  Trial Counsel
          b.  Appellate Counsel

**Ground XIII:** Ineffective Assistance of Counsel–Failure to object to State's opening statement

**Ground XIV:** Ineffective Assistance of Counsel–Failure to object to jury instructions

**Ground XV:** Ineffective Assistance of Counsel–Failure to object to inclusion of victim impact statement during trial

## II.     LEGAL STANDARD

"A state prisoner may seek a writ of habeas corpus in federal court if his confinement violates the federal Constitution or federal law." *Weaver v. Bowersox*, 241 F.3d 1024, 1029 (8th Cir. 2001) (citing 28 U.S.C. § 2254(a)). "Federal courts are bound by the AEDPA[2] to exercise only limited and deferential review of underlying state court decisions in habeas corpus cases." *Ryan v. Clarke*, 387 F.3d 785, 790 (8th Cir. 2004) (internal quotations omitted). Under 28 U.S.C. § 2254, federal courts may only grant relief to state prisoners when the state's criminal process:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1-2). These two relevant subsections distinguish between errors of law and errors of fact, and each is employed with its own standard of review. The first subsection's

---

[2] The AEDPA is an initialism for the Anti-Terrorism and Effective Death Penalty Act of 1996.

inquiry focuses on whether the state court "arrive[d] at a conclusion opposite to that reached by the [United States Supreme Court] on a question of law," or whether "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The inquiry under the second subsection turns on whether the petitioner can demonstrate by clear and convincing evidence that the state court adjudication failed to make reasonable findings of fact. *See Middleton v. Roper*, 455 F.3d 838, 854 (8th Cir. 2006).

## III.    ANALYSIS

### a.    Timeliness of Claims added in the Amended Petition (Grounds XIII-XV)

The State first challenges the timeliness of three claims Barton raises for the first time in his amended petition. (Doc. # 45, pp. 18-23). Under the AEDPA, state prisoners have one year to seek federal habeas relief from when the date their judgment of conviction became final. *Streu v. Dormire*, 557 F.3d 960, 961 (8th Cir. 2009). Any amendments to a habeas petition must also be filed within the same one-year limitations period. *See United States v. Craycraft*, 167 F.3d 451, 456-57 (8th Cir. 1999). "This one-year statute of limitations is tolled, however, during the time in which a '*properly filed application* for State post-conviction or other collateral review with respect to the pertinent judgment . . . *is pending*.'" *Streu*, 557 F.3d at 961 (quoting 28 U.S.C. § 2244(d)(2)) (emphasis added). "To qualify as a 'properly filed' application for state post-conviction relief, so as to toll the statute of limitations under § 2244(d)(2), the application must be 'in compliance with the applicable laws and rules governing filings.'" *McMullan v. Roper*, 599 F.3d 849, 853 (8th Cir. 2010) (quoting *Artuz v. Bennett*, 531 U.S. 4, 8 (2000)). "A properly filed application is one that meets all of the state's procedural requirements." *Id.* (quoting *Beery v. Ault*, 312 F.3d 948, 950-51) (8th Cir. 2002)). Federal courts have an

Case 4:14-cv-08001-GAF    Document 59    Filed 04/09/18    Page 9 of 43

independent duty to evaluate the timeliness of state court proceedings. *Lewis v. Norris*, 454 F.3d 778, 780 (8th Cir. 2006).

Here, the sole question is whether the motion Barton filed in the Circuit Court of Cass County on June 9, 2015 tolled the relevant statute of limitations. [3] If his filing tolled the statute, then the amended petition falls within § 2244's one-year limitation period; if not, then the amended petition is untimely. The State contends that the Missouri procedural rules do not provide for a "motion to reopen," and absent the state court finding that Barton's counsel abandoned him, Barton's filing is insufficient to toll the statute. However, Barton's motion was not titled a "motion to reopen"; it was styled as a "Request for finding of abandonment of counsel." (*See* Docket Sheet). The Missouri Supreme Court has previously discussed such a styling. *See Eastburn v. State*, 400 S.W.3d 770, 774-775 (Mo. 2013) (en banc) (describing elements of an abandonment of counsel claim). In *Eastburn*, the court encountered a "motion to reopen," in which a prisoner attempted to bring several untimely habeas claims after previously exhausting her post-conviction appeals. *Id.* at 773. The state filed a motion to dismiss, but entered into an "agreement to reopen" with Eastburn for the limited purpose of determining whether she was abandoned by her post-conviction counsel. *Id.* Despite ultimately finding against Eastburn, the Missouri Supreme Court agreed that habeas petitioners can file post-conviction abandonment claims out of time in certain limited circumstances. *Id.*; *see also Moore v. State*, 328 S.W.3d 700, 702-03 (Mo. 2010) (en banc).

> While there is no provision in [the Missouri Rules of Civil Procedure] to allow late filings, this Court has recognized a late filing may be accepted when a movant has

---

[3] The State also argues that Barton's Amended Petition does not relate back to the original petition, nor is it subject to equitable tolling. (Doc. # 45, pp. 21-23). Barton would presumably be entitled to argue both doctrines as alternative bases to amend his petition, but Barton waived both in his Traverse. (Doc. # 56, p. 10).

been abandoned by postconviction counsel. Abandonment by post-conviction counsel occurs when: (1) when post-conviction counsel fails to file an amended motion and the record shows the movant was deprived of meaningful review of the claims; or (2) when post-conviction counsel files an untimely amended motion. Abandonment also may occur when the overt action of post-conviction counsel prevents the movant from filing a timely original motion.

A motion to file an untimely post-conviction relief motion is not the same as filing a motion to re-open. When a movant has been abandoned by post-conviction counsel, the opportunity for the movant to file a timely post-conviction motion has passed. Accordingly, there is nothing to re-open. While parties may have referred to this motion as one to re-open the post-conviction proceedings based on abandonment, this nomenclature does not exist in our rules and should not be used henceforth.

*Eastburn*, 400 S.W.3d at 774 (internal quotations and citations omitted).

However, even though Missouri precedent allows for Barton's motion, the question of whether the motion was properly filed in state court and pending during the relevant period requires a separate inquiry. *See Artuz*, 531 U.S. at 8-9 (stating "the question whether an application has been properly filed is quite separate from whether the claims contained in the application are meritorious and free of procedural bar" (emphasis omitted)); *see also Walker v. Norris*, 436 F.3d 1026, 1030 (8th Cir. 2006) (considering whether a post-conviction relief petition is properly filed, despite the claims themselves being invalid). The United States Supreme Court, in *Pace v. DiGuglielmo*, offers the following rationale:

In *Artuz v. Bennett* . . . we held that time limits on postconviction petitions are "condition[s] to filing," such that an untimely petition would not be deemed "properly filed." However, we reserved the question we face here: "whether the existence of certain exceptions to a timely filing requirement can prevent a late application from being considered improperly filed." Having now considered the question, we see no grounds for treating the two differently.

As in Artuz, we are guided by the "common usage" and "commo[n] underst[anding]" of the phrase "properly filed." In common understanding, a petition filed after a time limit, and which does not fit within any exceptions to that limit, is no more "properly filed" than a petition filed after a time limit that permits no exception. The purpose of AEDPA's statute of limitations confirms this commonsense reading. On petitioner's theory, a state prisoner could toll the

11

statute of limitations at will simply by filing untimely state postconviction petitions. This would turn § 2244(d)(2) into a de facto extension mechanism, quite contrary to the purpose of AEDPA, and open the door to abusive delay.

544 U.S. 408, 413 (2005) (internal citations omitted). Like *DiGuglielmo*, Barton's underlying motion that requested the Circuit Court of Cass County find he was abandoned by counsel relies on certain enumerated exceptions to timely-filing requirements. *Compare Barton VI*, 486 S.W.3d at 337-38 (discussing precedential exceptions for timely-filing that relate to abandonment in Missouri) *with DiGuglielmo*, 544 U.S. at 411 n.1 (listing statutory exceptions[4] for timely-filing that relate to collateral appeals in Pennsylvania). Also like *DiGuglielmo*, the state courts involved in Barton's latest post-conviction proceeding determined that Barton's claim did not meet any relevant exception:

> Mr. Brotherton filed a timely amended motion on behalf of Mr. Barton asserting 48 claims and six grounds for relief. Mr. Barton's allegation is that this was inadequate because Mr. Brotherton failed to include "vital" issues in his amended motion that were later deemed waived on appeal. This in turn, Mr. Barton argues, deprived him of the fair disposition of his Rule 29.15 proceeding. In other words, Mr. Barton is claiming that Mr. Brotherton's illness made him miss claims he otherwise would have brought. Mr. Barton's claim is one of ineffective assistance of post-conviction counsel, which is categorically unreviewable in Missouri state courts.
>
> . . .
>
> Whether or not Mr. Barton has a cognizable federal claim of ineffective assistance . . . he does not have a claim of abandonment under Missouri law and was not required to seek further relief in Missouri courts as a necessary step to pave the way for a federal habeas petition.
>
> Mr. Barton nonetheless did file this claim of abandonment. The motion court did not clearly err in overruling it without an evidentiary hearing. His claim does not fit within Missouri's definition of "abandonment" and is not cognizable in Missouri courts.

---

[4] The three exceptions to the Pennsylvania Postconviction Relief Act discussed in *Pace* are (1) if governmental interference prevented filing; (2) in a new constitutional rule is made retroactive; and (3) if new facts arise that could not have been discovered through due diligence. *Pace*, 544 U.S. at 413 n.1; 42 Pa. Cons. Stat. §§ 9545(b)(1)(i)-(iii) (1998).

*Barton VI*, 486 S.W.3d at 338-39 (internal citation omitted).

Barton challenges the State's argument by citing to *Streu*, in which the Eighth Circuit concluded that a motion to reopen that alleges abandonment by post-conviction counsel was a properly-filed motion sufficient to toll the AEDPA's statute of limitations. *Streu*, 557 F.3d at 965. However, the *Eastburn* court answered the question of whether Missouri procedure allows for a "motion to reopen" in the negative. *See Eastburn*, 400 S.W.3d at 775. Further, *Streu* was decided without the benefit of several subsequent Missouri Supreme and Appellate Court decisions, in which various panels rebuked petitioners attempting to shoehorn ineffective assistance of counsel claims into a post-conviction request for a finding of abandonment. *See, e.g.*, *Bello v. State*, 464 S.W.3d 284, 292 (Mo. Ct. App. 2015) ("The scope of abandonment does not encompass perceived ineffectiveness of post-conviction counsel."); *Bain v. State*, 407 S.W.3d 144, 148 (Mo. Ct. App. 2013) ("While attempting to frame his claim in terms of abandonment in an attempt to fit within the exception . . . Appellant has alleged nothing more than ineffective assistance of post-conviction counsel"); *Sittner v. State*, 405 S.W.3d 635, 639 (Mo. Ct. App. 2013) ("[Movant]'s claim of abandonment does not fit any characterization of abandonment as defined by [Missouri's] Supreme Court"); *Jensen v. State*, 396 S.W.3d 369, 373 (Mo. Ct. App. 2013) ("Appellant's claims of abandonment are not cognizable under Missouri law); *Middleton v. State*, 350 S.W.3d 489, 492 (Mo. Ct. App. 2011) (stating the court lacked jurisdiction to hear the motion). Therefore, even though Barton's motion may be titled in a way contemplated by the *Eastburn* panel, the substance of his argument fails to meet any relevant exception that would otherwise allow untimely filing. *See Barton VI*, 486 S.W.3d at 338-39. Accordingly, the time during which the Circuit Court for Cass County and the Missouri Supreme Court were considering Barton's request is not excluded from the AEDPA's one-year limitations

period.[5]  *DiGuglielmo*, 544 U.S. 413.  The three claims Barton added for the first time in his amended petition, Grounds XIII-XV, are accordingly dismissed as untimely.

**b.      Procedural Default**

Defendant argues that several of Barton's claims must be dismissed as procedurally defaulted.  "Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism."  *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).  "Under the doctrine of procedural default, 'a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule.'"  *Franklin v. Hawley*, 879 F.3d 307, 311 (8th Cir. 2018) (quoting *Martinez*, 566 U.S. at 9).  The doctrine prevents state criminal defendants from depriving state courts the ability to hear claims in the first instance, and ensures defendants do not use federal courts as a method of circumventing state court authority.  *See Coleman v. Thompson*, 501 U.S. 722, 730-31 (1991).  In the Eighth Circuit, "a habeas petitioner must have raised both the factual and legal bases for each ineffectiveness of counsel claim in the state courts in order to preserve the claim for federal review."  *King v. Kemna*, 266 F.3d 816, 821 (8th Cir. 2001).  "'In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of

---

[5] The fact that the Missouri Supreme Court considered the merits of Barton's argument does not affect the Court's analysis.  *Runyan v. Burt*, 521 F.3d 942, 945 (8th Cir. 2008) (citing *Carey v. Saffold*, 536 U.S. 214, 225-26 (2002)).

federal law . . . .'" *Franklin*, 879 F.3d at 311 (quoting *Coleman*, 501 U.S. at 750) (ellipsis in original).

"Cause for a procedural default exists where something external to the petitioner, something that cannot fairly be attributed to him, impeded his efforts to comply with the State's procedural rule." *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (internal quotation and alterations omitted). For instance, a prisoner's post-conviction counsel's negligence does not qualify as cause, so as to excuse the prisoner's procedural default, "'because the attorney is the prisoner's agent, [and] under well-settled principles of agency law, the principal bears the risk of negligent conduct on the part of his agent.'" *Martinez*, 566 U.S. at 10 (quoting *Maples*, 565 U.S. at 280-81). "Thus, when a petitioner's postconviction attorney misses a filing deadline, the petitioner is bound by the oversight and cannot rely on it to establish cause." *Maples*, 565 U.S. at 281. However, the Supreme Court has noted the distinction between situations like *Coleman*, where the postconviction attorney fails to advance an issue in a collateral appeal, and one where an attorney errs during an initial collateral proceeding. *See Martinez*, 566 U.S. at 10-11. In situations like *Coleman*, federal courts can be assured that at least some level of state court reviewed the merit of the prisoner's claims, whereas federals courts in situations like *Martinez* lack such assurances. *Id.*

> When an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim. This Court on direct review of the state proceeding could not consider or adjudicate the claim. And if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims.

> The same is not true when counsel errs in other kinds of postconviction proceedings. While counsel's errors in these proceedings preclude any further review of the prisoner's claim, the claim will have been addressed by one court, whether it be the trial court, the appellate court on direct review, or the trial court in an initial-review collateral proceeding.

15

. . .

> From this it follows that, when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington* . . . . To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit

*Id*. at 10-11, 14 (internal citations omitted). Reduced to its basic elements, the *Martinez* equitable exception requires petitioners that wish to overcome their procedural default demonstrate the following: "(1) the claim of ineffective assistance of trial counsel was a 'substantial' claim; (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding; and (3) the state collateral review proceeding was the 'initial' review proceeding with respect to the 'ineffective-assistance-of-trial-counsel claim.'" *Dansby v. Hobbs*, 766 F.3d 809, 834 (8th Cir. 2014) (quoting *Trevino v. Thaler*, 569 U.S. 413, 423 (2013)).[6] Analysis of whether a claim has merit under *Martinez* overlaps with ineffective assistance of counsel analysis under *Strickland*. *See, e.g.*, *Deck v. Steele*, 249 F. Supp. 3d 991, 1024 (E.D. Mo. 2017); *Sund v. Young*, No. 5:14–CV–05070–KES, 2015 WL 4249405, at *4 (D.S.D. July 23, 2015); *Wright v. Hobbs*, No. 5:13–cv–210 KGB–JTR, 2015 WL 2374184, at *5-6 (E.D. Ark. May 18, 2015). "'Substantial,' in other words, means

---

[6] Shortly after announcing the *Martinez* equitable exception, the Supreme Court gently expanded the class of cases to which the exception applies, from those originating from states that require ineffective assistance of counsel claims to be advanced in an initial state-level postconviction proceeding, to those originating in states where "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *See Dansby*, 766 F.3d at 829 (internal quotation omitted).

16

'that reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *McLaughlin v. Steele*, 173 F. Supp. 3d 855, 870 (E.D. Mo. 2016).

## 1. Ineffective Assistance of Direct Appellate Counsel (Grounds VI, XIII, IX, X, & XII(b))

Barton alleges his counsel was ineffective for failing to advance several claims in his direct appeal, as well as ineffective for failing to appeal a claim denied by the Rule 29.15 motion court. Barton now brings these claims as Grounds VI, XIII, IX, X and XII(b).

Missouri law requires habeas petitioners to advance all ineffective assistance of counsel claims in their Rule 29.15 proceeding. Mo. Sup. Ct. R. 29.15; *see also Jolly v. Gammon*, 28 F.3d 51, 53 (8th Cir. 1994) (stating in Missouri, a claim must "be presented at each step of the judicial process to avoid default" (internal quotation omitted)). Here, Barton failed to do so. (Doc. # 45-88, pp. 30-42). Both parties seem to acknowledge that the Eighth Circuit has foreclosed the possibility that this Court might extend the *Martinez* equitable exception to ineffective assistance claims that arise from proceedings outside the trial process. (Doc. # 45, pp. 37-38; Doc. # 56, p. 13).

> Most circuits to address the point have declined to extend *Martinez* to claims alleging ineffective appellate counsel, and we agree. *Martinez* focused on a claim of ineffective assistance at trial, emphasizing that the Sixth Amendment right to trial counsel is a bedrock principle in our justice system and the foundation for our adversary system. The right to appellate counsel has a different origin in the Due Process Clause, and even the right of appeal itself is of relatively recent origin, so a claim for equitable relief in that context is less compelling. Most important, in announcing the equitable exception in *Martinez* for claims of ineffective assistance of counsel at trial, the Court was clear that the rule of *Coleman*—that ineffective assistance of counsel during state postconviction proceedings cannot serve as cause to excuse procedural default—governs in all but the limited circumstances recognized here. Those limited circumstances involved a claim that trial counsel was constitutionally ineffective. We therefore

> decline to extend *Martinez* to claims alleging ineffective assistance of counsel on direct appeal.

*Dansby*, 766 F.3d at 833 (internal quotations and citations omitted). Barton notes that the United States Court of Appeals for the Ninth Circuit reached the opposite conclusion on similar facts, extending *Martinez*'s equitable exception to include attorney errors committed on direct appeal. *See Nguyen v. Curry*, 736 F.3d 1287, 1293-94 (9th Cir. 2013). Despite the Ninth Circuit's decision, this Court is bound by Eighth Circuit precedent. *Hood v. United States*, 342 F.3d 861, 864 (8th Cir. 2003). Barton cannot employ the *Martinez* equitable exception to excuse the procedural default of his ineffective assistance of direct appellate counsel claims. Further, the Eighth Circuit has also ruled that *Martinez* does not apply to ineffective assistance of post-conviction appellate counsel claims. *See Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012) (stating "[t]hus, unlike *Martinez*, [the petitioner] has already has his day in court; deprivation of a second day does not constitute cause"). Therefore, Barton's grounds VI, VIII, IX, X and XII(b) are denied.

### 2. Ineffective Assistance of Trial Counsel (Grounds V, VII, XI, XII(a))

### a. Ineffective Assistance of Counsel–Failure to impeach Katherine Allen (Ground V)

In his fifth claimed ground for relief, Barton argues that his defense counsel was ineffective for failing to impeach Katherine Allen on the basis of her past false statements, the benefit she received from the State in exchange for her testimony, and the full extent of her criminal history. (Doc. # 36, pp. 54-72). Barton did not advance this claim in prior state proceedings, thus procedural default analysis applies. *Franklin*, 879 F.3d at 311. The State contends that, regarding Allen, defense counsel was not ineffective and Barton was not prejudiced; thus, he fails to demonstrate cause for the purposes of *Martinez*. (Doc. # 45, pp. 47-56).

At the time of the fifth trial, Allen was a prisoner at the Madison Correctional Facility, located in Madison, Wisconsin. (Doc. # 36-15, p. 118). Allen had testified at the fourth trial, which initially resulted in a conviction but was overturned on a state post-conviction appeal.[7] (Doc. # 36-1). After introducing Allen to the jury, the prosecutor elicited testimony about six of her prior convictions, including felony forgery and charge fraud. (Doc. # 36-15, p. 118). She also stated that she had a fraudulent check fraud dismissed in Cass County, Missouri. (*Id.*). She then testified that she met Barton while she was previously imprisoned at the Lawrence County, Missouri jail. (*Id.* at 119). During her time at the Lawrence County jail, Allen served as the jail's "trustee." (*Id.* at 120). As trustee, Allen performed various chores, including cooking meals and delivering them to other prisoners. (*Id.*). She testified that, during the course of her duties, she engaged in several arguments with Barton. (*Id.* at 121-22). Allen described one of the arguments as follows:

> [Prosecutor]: What was the argument about?
>
> [Allen]: Well, that I didn't want to talk to him anymore or give him any kind of attention.
>
> . . .
>
> [Allen]: He would just get angry.
>
> [Prosecutor]: Once you told him that, did he say anything back to you?
>
> [Allen]: Yeah. He told me that - - asked me if I knew what he was in there for. I didn't say anything, and he said that he could get out of that little cell back there and kill me like he killed that old lady.
>
> [Prosecutor]: Did he ever talk to you about the age of the person that he talked about as being the old lady?

---

[7] Indeed, the fourth verdict was reversed was because Judge John Sims, Circuit Judge for Benton County, Missouri, had determined the prosecutors had failed to disclose Allen's entire criminal history to the defense, and because Allen had then committed perjury by drastically understating her criminal record while testifying under oath. (*Id.* at 15-22).

19

[Allen]: No, he did not.

[Prosecutor]: Did he tell you who the old lady was?

[Allen]: No, he did not.

[Prosecutor]: Did he use any terminology other than the fact of saying she was an old lady?

[Allen]: No.

[Prosecutor]: No, this that you are talking about, did it happen one time or more than one time?

[Allen]: Probably at least five times.

[Prosecutor]: Was it the same threats?

[Allen]: Same threats.

(Doc. # 36-15, pp. 118-122). After the State's concluded its direct examination, the following

exchange occurred on cross-examination:

[Defense Counsel]: Ms. Allen, you just told this jury that you have six prior convictions; correct?

[Allen]: Yes, I did.

[Defense Counsel]: Did you forget about 7, 8, 9, 10, 11, 12, 13 convictions, or are you sticking with the 6?

[Allen]: I don't know how you are looking at those, though, because that was on my other case. It ran all together. So I'm not sure how you are looking at them.

[Defense Counsel]: I am looking at them as convictions. How many times have you been convicted? Give the jury, if you can, even a ballpark.

[Allen]: I would stick at six.

[Defense Counsel]: Okay. We are going to go over some of those six.

[Allen]: Okay.

(*Id.* at 123).

20

After the above-quoted dialogue, Barton's defense counsel proceeded to exhaustively recite and question Allen on twelve additional charges she faced between 1978 and 1998, an exchange that spans nine pages of the trial transcript.  (*Id.* at 123-31).  During his cross-examination, he made a record of her previous crimes that involved deceit, such as her convictions for forgery and check fraud.  (*Id.*).  Defense counsel also questioned Allen on her repeated uses of various aliases during that time period.  (*Id.* at 126-29).  Defense counsel's line of questions into Allen's prior deceptive behavior was subject to multiple objections, in which the prosecution took exception to defense counsel's various attempts at impeaching Allen's credibility.  (*Id.* at 132, 134, 139).

Courts "generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel."  *United States v. Orr*, 636 F.3d 944, 952 (8th Cir. 2011) (internal quotation omitted).  "In that vein, the Eighth Circuit has found constitutionally deficient performance of trial counsel based on ineffective cross-examination where counsel allowed inadmissible devastating evidence before the jury or when counsel failed to cross-examine a witness who made grossly inconsistent prior statements."  *Id.* (internal quotation and alteration omitted).  Here, Barton does not contest that his defense counsel failed to confront Allen with her past deceptive acts or that he failed to mount any kind of impeachment.  Instead, he largely quarrels with the degree to and manner of which defense counsel attacked Allen's credibility.  He contends that defense counsel's tactics were "substandard" and only made it appear to the jury that Allen was being bullied on the stand. Barton simply states that defense counsel should have gone about impeaching Allen in a different manner.  However, "how much to impeach a witness is generally a matter of trial strategy left to the discretion of counsel."  *Dansby*, 766 F.3d at 835.  "[T]here are a few, if any,

cross-examinations that could not be improved upon." *Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997). "[I]f that were the standard of constitutional ineffectiveness, few would be the counsel whose performance would pass muster." *Id.* (internal quotation omitted). In this circumstance, Barton's defense counsel questioned Allen about her criminal history at length, and specifically as it related to her tendency to behave deceptively. (Doc. # 36-15, pp. 123-31). While others may have adopted a different strategy, "there are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. So long as defense counsel made thorough investigation prior to examining Allen at trial, Barton's ineffective assistance claim fails as a matter of law. *See id.* at 690 (stating "strategic choices made after thorough investigation . . . are virtually unchallengeable"). Accordingly, Barton fails to demonstrate his Ground Five is a substantial claim, and it is thus denied.

**b. Ineffective Assistance of Counsel–Failure to call witness to rebut State's blood spatter expert (Ground VII)**

Barton next alleges that his defense counsel was ineffective for failing to call his own expert to contradict the State's blood spatter expert. (Doc. # 36, pp. 72-87). Barton raised a similar claim before the Missouri Supreme Court in his most recent state post-conviction hearing. *See Barton V*, 432 S.W.3d at 755-56. The Missouri Supreme Court summarized the proceedings as follows:

> At the trial, the State called a blood spatter expert to testify that several of the blood stains on Barton's shirt were consistent with medium to high velocity impact spatter. The expert testified that this type of spatter can come from the blood being propelled through the air after something impacts the blood, *i.e.*, that the spatter was consistent with stabbing or striking a victim. Instead of calling a spatter witness of their own, defense counsel thoroughly cross-examined the State's expert, attempting to undercut his conclusions and his credentials. Counsel also used the cross-examination of the State's expert to attempt to discredit the entire field of blood spatter analysis, calling it a "junk science."

*Id.* at 755. The Missouri Supreme Court then ruled that:

Based on this record, Barton has not carried his burden of proving either that counsel's investigation of blood spatter experts was insufficient or that counsel's decision not to call a blood spatter expert was a matter of trial strategy. Defense counsel's testimony demonstrates that they conducted a thorough investigation and specifically decided that calling an expert would be detrimental to the defense.

Therefore, the motion court did not clearly err in finding that Barton received effective assistance of counsel based on counsel's failure to call a blood spatter expert.

*Id.* at 756.

Barton argues the Missouri Supreme Court's prior ruling has no preclusive effect, as his claim before this Court, while related, is more narrowly drawn and relies on a separate factual basis. (Doc. # 56, p. 80). If that was true, Ground VII would be subject to procedural default analysis. *Franklin*, 879 F.3d at 311. However, review of Barton's previous filings demonstrates the marked similarity between the claims. In the relevant Amended Motion to Vacate, Set Aside, or Correct the Judgment or Sentence & Request for an Evidentiary hearing, filed May 17, 2013 in the Circuit Court of Cass County, Missouri, he styles the claim "Failed to Investigate/Rebut Blood Spatter evidence," and contests the manner in which his trial counsel chose to confront the State's expert. (Doc. # 45-77, p. 177). He argued that his trial counsel should have attacked the expert's qualifications and attempted to impeach him on the basis of his prior employment record with the Kansas City Police Department. (*Id.* at 178-79). Most notably, Barton contends that, had his counsel contacted a separate expert, there is a likelihood Barton would have mounted a more capable defense. (*Id.* at 180-81). Indeed, he reasserted on his last state post-conviction appeal that "[t]he motion court clearly erred denying counsel was ineffective for failing to call a blood spatter expert, like Stuart James . . ." (Doc. # 45-91, p. 12).

In support of Barton's latest blood spatter claim, he submits an affidavit prepared by a separate blood spatter expert. (Doc. # 36-3). The affiant, Lawrence Renner, testified at Barton's last state post-conviction trial:

> Also at the motion hearing, Barton called two blood spatter experts. The first[8] allegedly was the expert who Barton's trial counsel spoke to at Life in the Balance. That expert testified that he did not remember speaking with Barton's trial counsel and that he would need around 30 hours to render an opinion on the case. The second expert was Stuart James, whom Barton alleges his counsel should have called to testify. James testified that the number of spots was insufficient to establish a high velocity impact pattern. James also testified that those same spots were not transfer stains, but that they had to have been airborne when they came in contact with Barton's shirt. James confirmed the State's expert's testimony that the stains were consistent with high velocity impact spatter, but said that the number of spots was insufficient to establish a pattern.

*Barton V*, 432 S.W.3d at 756. In sum, the affidavit is largely a resubmission of his prior testimony. (Doc. # 36-3). For these reasons, the Court finds that Barton is advancing his previous argument, and the Court can only reverse the Missouri Supreme Court's decision if it resulted from an unreasonable application of constitutional law, or involved an unreasonable finding of fact. 28 U.S.C. § 2254(d)(1-2).

As the *Barton V* court observed, "'[g]enerally, the selection of a witness and the introduction of evidence are questions of trial strategy and are virtually unchallengeable.'" 432 S.W.3d at 755 (quoting *Johnson v. State*, 333 S.W.3d 459, 463 (Mo. 2011) (en banc)). "'[D]efense counsel is not obligated to shop for an expert witness who might provide more favorable testimony.'" *Id.* (alteration in original) (quoting *Johnson*, 333 S.W.3d at 464); *see also Marcrum v. Luebbers*, 509 F.3d 489, 511 (8th Cir. 2007) (stating "[w]here counsel has obtained the assistance of a qualified expert . . . counsel has no obligation to shop for a better expert"). In this circumstance, Barton cannot point to an argument that the Missouri Supreme Court failed to

---

[8] Affiant, Lawrence Renner.

consider, nor does he demonstrate clear and convincing evidence the court made an unreasonable factual finding or came to an unreasonable conclusion of law. *See* 28 U.S.C. § 2254(e)(2). He simply says his counsel should have gone about controverting the blood spatter evidence in a different manner. However, even if "[h]indsight now suggests that a different strategy might have been more effective . . . this does not mean trial counsel was ineffective." *Nave v. Delo*, 62 F.3d 1024, 1036 (8th Cir. 1995).

For these reasons, Barton fails to demonstrate his counsel was ineffective. Additionally, to the extent Barton is attempting to argue that he did not advance this claim in state post-conviction proceedings, the test under *Martinez*'s equitable exception overlaps with general *Strickland* principles, *see McLaughlin*, 173 F. Supp.3d at 870, and Barton cannot show this claim is a substantial one, to which reasonable jurists could debate or agree that his petition should have been resolved in a different manner. Barton's Ground Seven is denied.

### c. Ineffective Assistance of Counsel–Failure to develop and present mitigation defense (Ground XI)

In Barton's eleventh ground for habeas relief, he argues that his trial counsel was ineffective for failing to develop and present a mitigation defense for the trial's penalty phase. (Doc. # 36, pp. 87-102). Barton contends that his counsel ignored an array of viable trial strategies, and instead opted for one that casted his client in a disparaging light.

In this claim, Barton again raises an argument that resembles claims previously raised during his state post-conviction proceedings. As the State succinctly summarizes, Barton raised the following arguments that relate to Ground Eleven in his state post-conviction motion:

> 1. Counsel failed to contact Dr. Merikangas after prior postconviction counsel urged them to do so and did not call Dr. Merikangas to present evidence regarding Barton's diminished capacity.

25

2. Counsel failed to hire an adequate mitigation specialist, but instead delegated that task to Kim Freter, co-counsel, who failed to conduct an adequate investigation.

3. Counsel failed to investigate and/or call several of Barton's family and friends who would have testified regarding Barton's difficult childhood and his attitude after the 1974 brain injury.

4. Counsel failed to adequately develop and present the testimony of Lucy Engelbrecht and Donna Potts, and for not investigating or calling Steve Engelbrecht, Lucy's son, to discuss the positive impact Barton had on his life.

5. Counsel failed to advance an adequate closing argument on Barton's behalf, effectively leaving Barton without counsel.

(Doc. # 45, pp. 42-43; Doc. # 45-77, pp. 170-87). The state motion court denied the five claims.

(Doc. # 45-86, pp. 72-76). Barton also raised three more claims that relate to Ground XI in his

state post-conviction motion appeal to the Missouri Supreme Court:

1. Counsel was ineffective for failing to call Dr. Merikangas to establish that, due to a brain injury, Barton was predisposed to violent impulsive acts.

2. Counsel was ineffective for not calling Juanita Branan, Marie Johnson, Joyce Rogers, Robert Barton, Mary Reese, and Ralph Barton, Jr., to testify that Barton had an abusive past and became predisposed to violent acts following a head injury.

3. Counsel was ineffective because his penalty phase argument was rambling and incoherent to the point that it became prejudicial, arguing that counsel did not argue mitigating evidence but, instead, argued that the death penalty was morally repugnant.

(Doc. # 45, p. 43; Doc. # 45-88, pp. 133-35, 139-54). The Missouri Supreme Court determined

those three claims failed as well. *Barton V*, 432 S.W.3d at 757-59. However similar these

claims are to Barton's current Ground XI, the State concedes that the claims are sufficiently

different so as to constitute a new claim, and argues that the Court must apply procedural default

analysis. (Doc. # 45, p. 44).

As stated above, procedural default can only be overcome through a showing of cause for the default, and resulting actual prejudice. *Franklin*, 879 F.3d at 311. Under *Martinez*, ineffective assistance of counsel serves as "cause," so long as the claim is substantial, in that reasonable jurists could debate or agree the claim deserves to proceed further. *See Martinez*, 566 U.S. at 14.

The Missouri Supreme Court discussed trial counsel's choice of mitigation phase strategy at length in *Barton V*:

> At the motion hearing, defense counsel testified that their main strategy in the penalty phase was to focus on residual doubt concerning whether Barton was actually guilty of the crime. Counsel testified that it was their desire to avoid presenting any witnesses whose testimony would have made it more likely that Barton committed the crime. Counsel felt that the prosecution's case was fairly thin and decided that Barton's best chance of avoiding death would be to use any of the jury's remaining doubt of Barton's guilt to their advantage. Counsel also testified that Barton did not want to present any witnesses to beg for his life. Counsel also wanted to avoid presenting witnesses who had testified at prior trials and had not been persuasive. The motion court found that this was a reasonable trial strategy.
>
> . . .
>
> During the penalty phase, trial counsel presented testimony from three witnesses: two women Barton had met through a prison ministry and Barton's current wife, whom Barton met when she began sending him letters as part of a pen pal organization. Each of these three women testified that Barton was an important part of her life and that each would miss Barton very dearly if he were to be executed. His wife testified that Barton had been a positive influence on her son and that he too would find Barton's execution difficult to bear. On cross-examination of these witnesses, the prosecution's questioning attempted to cast doubt on how much these witnesses would miss Barton by asking if they were ever afraid of him or if they knew what he had done.
>
> Defense counsel's closing argument made use of both the testimony of the witnesses and the prosecution's cross-examination. Defense counsel's argument suggested that the death penalty was morally repugnant and ignored the feelings of the three witnesses who testified on Barton's behalf. Counsel argued that the jury should consider the testimony of the three witnesses in determining whether death was appropriate. Specifically, counsel stated:

> I want to talk to you about what mitigating circumstances are.
> Mitigating circumstances are things that aren't listed. They are
> simple human things.... [Barton's wife] loves her husband.
> [Barton's stepson] loves his stepfather. Those are mitigating
> circumstances.... You can find that [Witness] loves [Barton] like a
> son.... [T]o suggest that she is not right somehow because she
> believes this man has a value, that she is somehow inferior, that her
> feelings of loss are somehow inferior because she loves this man,
> that is a repugnant stance to take.

> Defense counsel coupled this individualized evidence with a plea for mercy.
> Mercy is a valid sentencing consideration. Counsel argued that the jury should
> show mercy because Barton had people who cared for him, because the death
> penalty was immoral, and because the jury should be "better" than the "Walter
> Bartons of the world."

432 S.W.3d at 757-59.

Barton objects to the strategy of his trial counsel for several reasons, and his arguments can be grouped into two categories: first, Barton argues that trial counsel did not advance the chosen line of defense in an effective manner; and second, that counsel should have chosen a different defense strategy.

Barton attempts to characterize his trial counsel's effort of advancing the dual "plea of mercy" and "residual doubt" defense as so insufficient that it amounted to the presentation of no defense. (Doc. # 36, 91-97). However, both are valid lines of defense, especially when defense counsel pursues them with an understanding of the relative weaknesses of other mitigation strategies. *See Darden v. Wainwright*, 477 U.S. 168, 186 (1986) ("In this case, there are several reasons why counsel reasonably could have chosen to rely on a simple plea for mercy from petitioner himself."); *Williams v. Roper*, 695 F.3d 825, 833-34 (8th Cir. 2012) (analyzing whether mitigation strategy based on lingering residual doubts of guilt among jurors was effective assistance of counsel). Even in *Antwine v. Delo*, where an appeal to the juror's sense of mercy in the penalty phase was rejected as constitutionally ineffective, the Eighth Circuit's stated

28

rationale for the decision related to counsel's failure to perform an adequate pre-trial investigation, and not counsel's choice of defense strategy alone. 54 F.3d 1357, 1367-68 (8th Cir. 1995); *see also Rompilla v. Beard*, 545 U.S. 374, 386-390 (2005) (analyzing whether an otherwise-valid reasonable doubt strategy was hamstrung by a failure to investigate). Here, Barton admits that repeated litigation assured that any witnesses were well-known. (Doc. # 36, pp. 89-90). Further, varying strategies had been tested and confirmed as unsuccessful, trial counsel possessed this knowledge, and the team wanted to avoid strategies that had failed in the past. (Doc. # 45-75, p. 487, 530). As the Missouri Supreme Court stated, "Barton has not demonstrated that his counsel's strategy was unreasonable, only that a reasonable alternative strategy existed." *Barton V*, 432 S.W.3d at 758. The existence of reasonable and effective alternative strategies does not preclude a Court determining that the chosen defense strategy was not ineffective. *Strickland*, 466 U.S. at 689. As choice of trial strategies made after thorough investigation of the facts and law are "virtually unchallengeable," Barton's trial counsel was not ineffective for their chosen mitigation defense. *See id.* Thus, Barton fails to demonstrate this portion of his ineffective assistance claim is a "substantial" one, for the purpose of *Martinez*. 566 U.S. at 14.

The other categories of Barton's complaints relates to the skill with which Barton's trial counsel undertook his mitigation defense. Barton focuses on the quality of the opening statement presented by David Bruns and the closing statement delivered by Brad Kessler. (Doc. # 36, pp. 92-93). In his initial suggestions in support of his motion, Barton contends that various statements made by both destroyed the credibility of their overall strategy, such as when counsel stated ". . . we never went, and said, 'well, it wasn't Walter. . .'" (Doc. # 36-16, p. 52), or when counsel stated that Barton ". . . is guilty beyond a reasonable doubt. Okay? (*Id.* at p. 55). (Doc. #

36, pp. 92-93). However, in his Traverse, Barton concedes the State's point that he invoked both statements out of context. (Doc. # 56, pp. 102-103). Closer survey of Barton's other objections reveals the same. That subsequent counsel would phrase various aspects of his defense in a different manner does not demonstrate the previous counsel was ineffective. *Strickland*, 466 U.S. at 689 (stating "[e]ven the best criminal defense attorneys would not defend a particular client in the same way"). Barton's trial counsel was not ineffective for failing to investigate or develop a mitigation strategy, nor were they ineffective in the manner which they pursued their mitigation strategy.

Accordingly, Barton fails to demonstrate the requisite elements to merit shelter from procedural default under the *Martinez* equitable exception. To the extent Barton instead argues that general 28 U.S.C. § 2254 analysis applies, the Missouri Supreme Court made reasonable determinations of fact and reasonably applied constitutional law in their decision. Barton's Ground XI is denied.

### d. Ineffective Assistance of Counsel–Failure to assert at trial that Barton was incompetent (Ground XII(b))

Barton next argues that his counsel was ineffective for failing to assert that he was incompetent to stand trial. (Doc. # 36, pp. 102-111). Barton argues that his counsel knew or should have known he suffered from brain damage, and should have taken steps to suspend the proceedings so that he could seek treatment. (*Id.*). Barton's federal habeas counsel contends that he has, for the first time in Barton's experience, retained an expert that specializes in the type of brain damage Barton suffers from, and that expert believes Barton faces deficits in his ability to think, absorb information, sequence and predict events, moderate his mood, and consistently and reliably reach conclusions. (*Id.* at 107; Doc. # 36-4).

30

"A defendant is incompetent to stand trial if he is unable to understand the charges he faces and the consequences involved or he is unable to communicate with counsel 'with a reasonable degree of rational understanding.'" *Forsyth v. Ault*, 537 F.3d 887, 891 (8th Cir. 2008) (quoting *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996)). "A defendant is presumed competent and bears the burden of proving otherwise." *Id.* Barton now contends that the available evidence should have led any reasonably effective attorney to raise the issue of his competency to the trial court.

Barton's trial attorneys in 2006 were not working from a blank slate, and instead had over a decade's worth of defense experience from which to draw from in crafting their strategy. Counsel had access to various records, such as the pre-trial medical and psychiatric assessment prepared by Dr. H.P. Robb, prior to Barton's first trial. (Doc. # 45-93). Dr. Robb opined, in part, the following:

> The defendant does not suffer from a mental illness or defect as defined in Section 552.010 RSMO.

> The defendant has the ability to communicate with his attorney in his own defense and to conduct himself appropriately in a courtroom setting.

> It is [his] opinion on the basis of the present examination and background information that the defendant most probably did not suffer from a mental disease or defect during the time of the alleged criminal conduct and that he was able to conform his conduct to the requirements of law.

(*Id.*).

Additionally, trial counsel had access to the results of a neuropsychological evaluation performed by Dr. Dennis G. Cowan in 1993. (Doc. # 45-94). The express purpose of the evaluation was to assess Barton's level of function, and to rule out the presence of any cortical brain damage or dysfunction, which is the brain injury Barton now claims. In the examination, Barton told Dr. Cowan the following:

31

> I told my lawyer I did not want this evaluation. I don't trust you [Dr. Cowan]. I don't trust any doctor and especially no psychiatrist. I only agreed to go along with this because you came all the way to see me.

(Doc. # 45-94, p.1). Dr. Cowan went on to note that Barton understood Dr. Cowan's statements, and had a past history as a good student in school, and reached all developmental milestones at normal rates. (*Id.*). Dr. Cowan acknowledged Barton's past head injuries, and noted that while Barton may suffer mild to moderate impairment, his opinion was limited to not being able to rule out the presence of cortical brain dysfunction. (*Id.*). Dr. Cowan later testified as to the contents of his evaluation at Barton's 1994 trial. (Doc. # 36-28, pp. 224-243). He largely reiterated the substantive portions of the report, responded "no" when asked if Barton was "crazy or anything," and admitted that Barton was functioning in a range comparable with 15-20 percent of the population, at least for the purposes of one intelligence measure. (*Id.* at 229, 237).

Counsel also had access to the opinion testimony of Dr. James Merikangas, an expert that testified at several of Barton's previous proceedings. He last testified before Barton's state post-conviction motion court, where Barton claimed his trial counsel was ineffective for failing to have Dr. Merikangas testify as an expert. *Barton V*, 432 S.W.3d at 757-58. Dr. Merikangas opined that Barton suffered from impulse control issues stemming from a brain injury. *Id.* at 757. However, "[t]he motion court . . . found that much of Dr. Merikangas' testimony was difficult to believe, not particularly persuasive, or 'seemed to defy common sense and logic.'" *Id.* at 758.

Although not raised as a ground for habeas relief in his state post-conviction motion, the motion court heard testimony regarding his most recent counsel's opinion of Barton's mental state:

> [Ted Bruce, Assistant Prosecuting Attorney]: Did you consider – well, let me ask you a more basic question. As you spoke to Mr. Barton, did you believe or have

any reason to believe that he suffered from some type of mental deficiency that made it either difficult or impossible for him to effectively communicate with you in preparing for trial?

[Brad Kessler, defense counsel]: He was very effective in communicating. You didn't like what he had to say a lot of the time but he got his point across.

[Bruce]: I am just wondering whether or not you thought or you saw anything or observed anything that made you believe that, maybe, you needed to again consult with a mental health expert about Mr. Barton?

[Kessler]: No. And again, I am going to say, I mean, our investigator on the case had been on death row with him for thirteen years. I mean, this is a guy who was a known factor to us, and so, no, I didn't think he was unable to understand or assist in his defense whatsoever.

. . .

[Bruce]: And based upon your experience in litigating these cases and based upon what you had observed, yourself, in dealing with Mr. Barton, did you feel that you saw anything or had an opinion about anything that caused you to believe that it was important to override his personal belief that this is how he wanted to proceed?

[Kessler]: No.

[Bruce]: You didn't decide based upon what you observed that you thought he had a mental disease or defense and that you should assert it regardless?

[Kessler]: Look, I don't think the guy was normal by any stretch of the imagination.

. . .

[Kessler]: I didn't think he was normal, you know, in any stretch of the imagination, but he was certainly competent to assist in his defense and to tell us what he wanted and not wanted.

(Doc. # 45-75, pp. 526-29). Further review of the record reveals that Barton repeatedly discouraged his attorneys from advancing any sort of competency defense across the many years and trials that separate the commission of the crime and his present motion before this Court. For instance, his original defense counsel, Daniel Gralike, testified at Barton's 1995 post-

33

conviction hearing, and stated that Barton had specifically ordered the team to not pursue a defense focused on his mental capacity. (Doc. # 45-11, p. 97-98).

As a general principle, "[c]ounsel [is] not obliged to disregard both [previous reports] and his client's wishes and further pursue a determination that his client was not competent to proceed." *King*, 266 F.3d at 824; *see also LaRette v. Delo*, 44 F.3d 681, 685-86 (8th Cir. 1995) (stating that counsel was not ineffective for following client's wish to not pursue competency defense). As Barton admits, much of the evidence he cites in this claim overlaps with his Ground XI claim that his counsel mounted a constitutionally ineffective penalty phase strategy. (Doc. # 36, p. 106). However probative his cited evidence may be for the purposes of evaluating mitigation strategies, the test of whether a defendant is competent to stand trial is a separate and more specific inquiry. "[P]resence of a mental illness does not equate with incompetency to stand trial." *United States v. Cook*, 356 F.3d 913, 918 (8th Cir. 2004). Instead, to be considered legally incompetent to stand trial, a defendant must be "unable to understand the charges he faces and the consequences involved or . . . unable to communicate with counsel with a reasonable degree of rational understanding." *Forsyth*, 537 F.3d at 891 (internal quotation omitted). The record demonstrates a defendant who reasonably communicated with his attorneys, repeatedly instructed them against pursuing a competency defense, and understood the nature and consequences of the charges he faced. Barton's attempt to reverse course at this late juncture does not overcome the record below. Barton's claim is denied.

### 3. Violation of the Fifth Amendment Double Jeopardy Clause (Ground I)

Barton next claims that the State of Missouri violated his Fifth Amendment guarantee to be free from being subject to double jeopardy during the course of his prosecution. "The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated

prosecutions for the same offense." *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982). "This clause provides a criminal defendant with three protections." *United States v. Amaya*, 750 F.3d 721, 724 (8th Cir. 2014) (internal quotation omitted). "'The first two guard against successive prosecution, either after an acquittal or after a conviction.'" *Id.* (quoting *Dodge v. Robinson*, 625 F.3d 1014, 1017 (8th Cir. 2010)). "The third protects against 'multiple punishments for the same offense.'" *Id.* (quoting *Bally v. Kemna*, 65 F.3d 104, 106 (8th Cir. 1995). "The Double Jeopardy Clause, however, does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding." *Oregon*, 456 U.S. at 672. "If the law were otherwise, the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again." *Id.* ( internal quotation omitted). However, the Clause may bar successive prosecution after mistrial when the State acted in a way deliberately aimed at goading defendant's counsel into moving for mistrial. *United States v. Radosh*, 490 F.3d 682, 685 (8th Cir. 2007) (quoting *Oregon*, 456 U.S. at 676).

Here, Barton claims that, prior to the first trial in April 1993, the prosecutor, Bob Ahsens, intentionally failed to give notice to defense counsel of the witnesses he planned to call for testimony. The relevant portions of the transcript are quoted below:

> MR. GRALIKE [Defense Counsel]: I have no problem with that. Although, we never received any endorsement for Larry Arnold for the state.

> MR. AHSENS [Prosecuting Attorney]: I believe he was endorsed. I certainly have reports of his anticipated testimony.

> MR. GRALIKE: I don't believe he's endorsed under the court file.

> MR. AHSENS: Well, if not, then out of an overabundance of caution I would move to endorse him now.

35

MR. GRALIKE: I would object to that, Judge. In fact, I'm not sure if anybody is endorsed, Bob.

*** 

THE COURT: You've had some time to look through the court file. I think from the look on people's face you've been unable to find anything where the witnesses have been endorsed or disclosed. Is that a fair assumption?

MR. AHSENS: Well, your honor, as far as the endorsement is concerned that I - Mr. McCormick may be able to speak more to that than [I]. On the disclosure, to be frank, while it does not show on the docket sheet, when I - I personally prepared this and mailed it to the public defender's office.

THE COURT: Do you know what date on or about?

MR. AHSENS: Yes, sir, I can tell you.

THE COURT: Did you send a copy to the clerk or?

MR. AHSENS: Yes, sir. At least it was my – please understand I directed my secretary to do so. I signed it and

THE COURT: You signed a certification, all right.

MR. AHSENS: I signed a certification in my file. This was part and parcel. It went out at the same time although I can't guarantee you it went under the same cover. There's a number of other motions.

THE COURT: And I guess the other side of the coin is, who it's addressed to, Mr. Gralike or Mrs. - ?

MR. AHSENS: Daniel Gralike, Capital Attorney, Office of the State Public Defender, 3402 Buttonwood, Columbia, Missouri 65201-3724.

THE COURT: I guess, Mr. Gralike, you as an officer of the court are telling us you didn't get that?

MR. GRALIKE: I'm not saying that. I'm not aware of that.

THE COURT: You're not saying that? Not that he didn't, but you didn't receive it. Is that what you're saying?

MR. GRALIKE: That's my understanding, Judge. I have not seen that.

MR. AHSENS: Now, Judge, let me say too, - Dan, let me show you this so you're aware of it. It was with the materials and receipt. It had all those with the police

36

reports. And that's the receipt you signed or someone at your office signed for it. You checked the items off I believe or someone for you did when we sent that material as well.

THE COURT: Did we discuss this before when we were here on the record as to witnesses? It's been a long time ago.

MR. AHSENS: Not that I recall, sir. Sir, let me make what record I can on this. According to my file I have a copy which included the signature and the date stamp and a letter. I'll show you what is - it says "Answer to Disclosure" which includes under paragraph one a lengthy list of witnesses and it's signed by myself with a certification service date of August 12, 1992.

THE COURT: This does not show anything sent to the file. I thought you –

MR. AHSENS: Well, it won't show that, sir, because normally the original would go to the file and the original would contain the certificate of service.

THE COURT: Well, is there a cover letter perhaps in your file that would show "Dear Clerk, please find enclosed for filing"?

MR. AHSENS: I don't have such a cover letter, sir, but I wouldn't necessarily file it.

THE COURT: But it seems as though Mr. Gralike didn't get it and neither did the Clerk.

MR. AHSENS: On the second issue let me show you something further. Accompanying that was a full packet of reports which included this receipt that the defense review and sign. Notice that it says "Thanks, Bob. Signed, D. Gralike." Certified mail receipt which I believe is for the packet that included both this receipt and the answer for disclosure. I'll look for a letter. I hadn't gotten that far in my file.

. . .

MR. AHSENS: ... Frankly, I thought I'd given meticulous disclosure. I am flabbergasted by the lack of any showing of file [sic] that that disclosure was filed. I believed and had no reason not to believe that it had been filed properly and disclosed to the defense. As I've told Mr. Gralike in the past, I have never played hide the ball with disclosure. I always try to give them everything I have and I thought we had done that. Lack of endorsement, I believed there was an endorsement. I believe I've seen one but I can't put my hands on it now.

. . .

[Following an off-the-record discussion, the following proceedings took place:]

37

THE COURT: All right, we're back on the record. We have Mr. Harris, the circuit clerk here with us who is going through his filings and he still has found nothing to indicate that the circuit clerk has received what was prepared by the attorney general's office. The defendant not having it puts us I think in a posture in which this case cannot go forward. Now Mr. Gralike, you earlier suggested unless this could be resolved that you were going to ask for a mistrial. Is that correct, sir?

MR. GRALIKE: That is correct, Judge.

THE COURT: Anybody want to speak to that? I don't know what else to say other than what the court has already alluded to. I see no way - I don't think that would work. You're shaking your head no, Mr. Ahsens.

MR. AHSENS: I have no further comment, Judge. Let me say this for the record ... It was my intention and certainly I thought I had scrupulously provided disclosure. I think Mr. Gralike will agree that we have talked frequently and have tried to do so. That particular document was not filed I cannot account for how that didn't happen since my file contains it and my co-counsel's file contains it. I am, as I said before, flabbergasted that it's not on file with the court. I cast no aspersions and I certainly don't blame the clerk for that, but something went amiss somewhere. This gentleman is very, I'm sure, very good at what he does. And I would have to say that there has been some error somewhere other than his office. If he doesn't have it, he doesn't have it. But we made every effort to provide full disclosure and I certainly thought I had. In my conversations with Mr. Gralike I believed that he had received this document. I'm not saying that – and please don't misunderstand – I'm not saying anything about your misrepresenting your failure to receive it, but had I had any inkling that this had not been received I would have corrected that error.

. . .

MR. GRALIKE: Judge, I'm going to request that Mr. Barton be discharged.

THE COURT: On what basis?

MR. GRALIKE: Well, does the State intend to refile? I don't know if they can or not.

MR. AHSENS: Well, since you're declaring a mistrial that doesn't require me to refile.

THE COURT: Just postpones this proceeding.

MR. GRALIKE: The jury's been sworn, hasn't it?

38

THE COURT: The jury has been sworn. I don't think that creates jeopardy.

(Doc. # 45-10, pp. 94, 96-99, 103–07).

Though Barton's case has reached the Missouri Supreme Court three times, albeit in various forms, only once has a panel of judges expressly discussed whether Ahsens' tactics should have barred the State's successive prosecution. *See Barton IV*, 240 S.W.3d at 711. The Missouri Supreme Court stated the following in its majority opinion:

> Without regard to the merits of the claim, the claim is barred by collateral estoppel. Appellant acknowledges that this precise issue was raised in his 1996 appeal featuring the same parties, and this Court, remanding for a new trial based on a different trial court error, necessarily concluded that the Double Jeopardy Clause did not preclude a new trial. Even were this Court to reconsider the merits, the claim still fails because there is no evidence that the mistrial was caused by prosecutorial misconduct. Instead, all the evidence points to the fact that the failure to endorse witnesses was merely inadvertent. The point is denied.

(*Id.*).

As a preliminary matter, it is important to note that *Oregon v. Kennedy*'s double jeopardy protection analysis focuses on the intent of the prosecutor. 456 U.S. at 679. "Absent intent to provoke a mistrial, a prosecutor's error in questioning a witness, improper remark in a closing statement, and even extensive misconduct do not prevent reprosecution." *United States v. Beeks*, 266 F.3d 880, 882 (8th Cir. 2001). The Eighth Circuit has previously discussed the superior position the trial court judge maintains when ascertaining whether a prosecutor's conduct gives rise to *Kennedy*'s protections. *See Jacob v. Clarke*, 52 F.3d 178, 182 (8th Cir. 1995) (noting that the state trial court's finding must be accorded deference); *see also United States v. Standefer*, 948 F.2d 426, 432-33 (8th Cir. 1991) (stating district court judge was in best position to make a *Kennedy* finding). Over the last 25 years, various trial court and motion court judges have analyzed claims involving Mr. Ahsen's failure to endorse witnesses at the first trial. (Doc. # 45-11, pp. 80-83, 93-94, 101-04; Doc. # 45-14, pp. 68-76; Doc. # 45-40, pp. 17-22, 64-65; Doc. #

39

45-44, pp. 51; Doc. # 45-51, pp. 37-54; Doc. # 45-83, pp. 54-55).  Further, the record supplied by the parties extensively documents the fact-finding conducted by the Missouri state courts regarding Movant's double jeopardy claim.  (*Id.*)  Simply stated, no court that has heard Movant's double jeopardy claim has voiced anything but skepticism.  This is not to say that the Missouri state courts have failed in any manner to seriously consider the implications that would follow a successful showing that Mr. Ahsens committed prosecutorial misconduct by intentionally withholding the witness endorsement list—simply that, in each instance, "Movant did not offer any evidence to establish an evil or improper motive on the part of the prosecutor." (Doc. # 45-83, p. 41).

Movant argues against the Missouri Supreme Court's direct factual finding, that all evidence shows that Ahsens's failure was inadvertent and not the result of any malevolent intent, by pointing to various ambiguities in the transcript, as well as circumstances surrounding the prosecution. For instance, Movant contends that the trial rule Ahsens failed to follow was so basic that any failure must be self-evidently intentional, that an issue involving the certificate of service proves that Ahsens forged a key document, and that a broader survey of Ahsens's conduct demonstrates a prosecutor that acted in bad faith.[9]  However these inferences do not constitute clear and convincing evidence that the Missouri Supreme Court unreasonably ascertained the relevant facts.  *See Garrison v. Burt*, 637 F.3d 849, 853 (8th Cir. 2011) (stating the standard with which a federal district court reviews a habeas petition under 28 U.S.C. §

---

[9] Several of these arguments arise for the first time in Movant's Traverse (Doc. # 56), and not in his initial Suggestions in Support of the Amended Petition (Doc. # 33).  Generally, arguments raised for the first time in a reply brief are improper and will not be considered by the Court. *Bank of Am., N.A. v. UMB Financial Servs.*, 618 F.3d 906, 911 n.3 (8th Cir. 2010); *Turnage v. Fabian*, 606 F.3d 933, 942 n.9 (8th Cir. 2010).  However, the Court considers these arguments for the purpose of evaluating whether the Missouri Supreme Court's determination was reasonable.

2254).   After thorough review of the record, this Court agrees with the Missouri Supreme Court's conclusion that Ahsens' error was inadvertent.   Like other cases involving allegations of prosecutorial misconduct, this Court is doubtful that Ahsens designed a discovery violation in advance of a trial that, for his relevant purposes, seemed to be going well.   *See Amaya*, 750 F.3d at 726 (discussing whether the prosecutor engineered a discovery violation in advance of trial); *see also United States v. Washington*, 198 F.3d 721, 724-25 (8th Cir. 1999) (same).   Movant's Fifth Amendment double jeopardy claim is denied.

## IV.    EVIDENTIARY HEARING

Habeas petitioners often request courts to hold evidentiary hearings to assist in the adjudication of their claims.   "'[I]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.'" *Crawford v. Norris*, 363 F. App'x 428, 430 (8th Cir. 2010) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007)). The AEDPA provides the relevant standard:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A)    The claim relies on—
>
> (i)    A new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii)    A factual predicate that could not have been previously discovered through exercise of due diligence; and
>
> (B)    The facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

Case 4:14-cv-08001-GAF   Document 59   Filed 04/09/18   Page 41 of 43

28 U.S.C. § 2254(e)(2); *see also Cox v. Burger*, 398 F.3d 1025, 1030 (8th Cir. 2005). Even if § 2254 does not plainly preclude a district court from granting an evidentiary hearing, the court may still deny the hearing "if such a hearing would not assist in the resolution of [the] claim." *Johnston v. Luebbers*, 288 F.3d 1048, 1059 (8th Cir. 2002). In this circumstance, all of Barton's claims involve ascertaining matters of fact clearly documented by the record. Accordingly, and evidentiary hearing would not assist the Court in resolving his claims, and his request for an evidentiary hearing is denied.

## IV. CERTIFICATE OF APPEALABILITY

A movant can appeal a decision to the Eighth Circuit only if a court issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). A certificate of appealability should be issued only if a movant can make a substantial showing of a denial of a constitutional right. *Id.* § 2253(c)(2). To meet this standard, a movant must show reasonable jurists could debate whether the issues should have been resolved in a different manner or the issues deserve further proceedings. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). For the reasons stated throughout this Order, Barton fails to make the requisite showing for issuance of a certificate of appealability.

**CONCLUSION**

Barton fails to demonstrate that the Missouri Supreme Court made an unreasonable determination of fact, or made a decision involving an unreasonable application of federal constitutional law. Further, he cannot overcome the procedural default of many of his claims, nor does he demonstrate cause to establish they are entitled to the *Martinez* equitable exception. Barton also fails to show that an evidentiary hearing would assist the Court in the resolution of his claims. Barton's Petition for Writ of Habeas Corpus is denied without a certificate of appealability.

Case 4:14-cv-08001-GAF   Document 59   Filed 04/09/18   Page 42 of 43

**IT IS SO ORDERED.**

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED:  April 9, 2018